IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DALE KEVIN MCNEILL,          )
                             )
            Plaintiff,       )
                             )
      v.                     )   Civil Action No. 16-757-CFC
                             )
DONALD SNOW, et al.,         )
                             )
            Defendants.      )

---

Dale Kevin McNeill, Howard R. Young Correctional Institution. Pro Se Plaintiff.

Ryan Patrick Connell, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendant Steven Wesley.

Dana Spring Monzo, Esquire, and Karine Sarkisian, Esquire, White & Williams, Wilmington, Delaware. Counsel for Defendant Connections CSP Inc.

**MEMORANDUM OPINION**



December 5, 2019
Wilmington, Delaware

CONNOLLY, U.S. District Judge

## I. INTRODUCTION

Plaintiff Dale Kevin McNeill ("Plaintiff"), an inmate at Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983. (D.I. 2) Before the Court are Defendants' motions for summary judgment, opposed by Plaintiff in his combined motion to continue and motion for summary judgment and combined motion for summary judgment and motion to dismiss, and Defendant Steven Wesley's motion to dismiss for failure to prosecute.[1] (D.I. 51, 52, 55, 56) The motions have been fully briefed.

## II. BACKGROUND

### A. The Complaint

The Complaint alleges that on May 17, 2015,[2] Plaintiff was attacked by Defendant inmate Donald Snow ("Snow").[3] (D.I. 2 at 5) Plaintiff alleges that the assault was videotaped and replayed by HRYCI staff. (*Id.*) Plaintiff also alleges that Defendant Steven Wesley ("Wesley"), the former HRYCI warden, and security staff stood by and watched the assault and did nothing to help Plaintiff. (*Id.* at 6) Plaintiff alleges that Wesley housed three inmates in a two-person cell, and he did not supervise mentally-ill inmates. (*Id.*)

---

[1] The Court does not analyze whether dismissal is appropriate for Plaintiff's failure to prosecute given that summary judgment is appropriate on behalf of all Defendants.

[2] Medical records indicate that Plaintiff was assaulted on May 18, 2015.

[3] Snow has been served, but has not answered or otherwise appeared. He is not considered a state actor for purposes of 42 U.S.C. § 1983.

1

Following the assault, Plaintiff was taken to Christiana Hospital, treated, and released the next day. (*Id.* at 5, 7) Plaintiff alleges that HRYCI medical staff did not follow Christiana Hospital's follow-up care instructions for follow-up care and, as a result, he submitted a medical grievance to obtain the appropriate medical follow-up care. (*Id.* at 7) Plaintiff also submitted a grievance for medical problems that resulted from the assault. (*Id.*)

Plaintiff seeks compensatory damages

## B. Evidence of Record

On May 18, 2015, Plaintiff was assaulted by a fellow inmate. (D.I. 54, Ex. C at 41; D.I. 57 at 1) Plaintiff was taken by ambulance to the Christiana Hospital Emergency Room and diagnosed with a left ear laceration and concussion. (*Id.*) While there, he underwent a head CT scan that revealed no acute intracranial abnormality.[4] (D.I. 54, Ex. D; D.I. 57 at 2) Discharge instructions provided for follow-up with oral and facial surgery if the HRYCI infirmary was not able to manage Plaintiff's condition. (D.I. 54, Ex. C at 41; D.I. 57 at 3) Other discharge instructions were to keep Plaintiff's ear laceration clean and apply antibiotic ointment twice daily. (*Id.*)

On May 19, 2015, Plaintiff was admitted to the HRYCI infirmary for medical observation and supportive care, including neurological checks due to concussion. (D.I. 54, Ex. C at 41, Ex. E; D.I. 57 at 1) On May 20, 2015, while under medical observation,

---

[4] The first page of the report provides the results of a CT scan of the chest, abdomen, and pelvis. (D.I. 60) The report states, "sarcoidosis is suggested. If there are no old CT examinations for comparison, consider the need for followup study in 3-6 months." (D.I. 57 at 2; D.I. 60)

2

Plaintiff asked when his ear laceration would be cleaned, the nurse checked his chart, saw the order to clean the laceration, and cleaned the wound. (D.I. 54, Ex. C at 39; D.I. 57 at 5) On May 20, 2015, Plaintiff submitted a grievance seeking care for his ear laceration, and the grievance was resolved the same day. (D.I. 54, Ex. F, May 20, 2015 grievance #307191; D.I. 57 at 6)

On May 21, 2015, Plaintiff was discharged from the infirmary with no complications and all symptoms of headache, unsteady gait, and dizziness resolved. (*Id.* at Ex. C at 39) When Plaintiff was seen for a follow-up on May 28, 2015, he stated he continued with an equilibrium issue, although it was resolving. (*Id.* at 38) On May 29, 2015, Plaintiff submitted a sick call slip and asked for removal of the left ear sutures.[5] (*Id.* at Ex. G, May 29, 2015 Sick Call) In response to the sick call slip, Medical staff saw Plaintiff on June 4, 2015. (*Id.* at Ex. C at 38) Plaintiff was examined and medical records indicate the laceration was completely healed with no sutures seen. (*Id.*)

Over the next few months, Plaintiff continued with treatment for lower back, right ankle, and neck pain as well as lower extremity swelling. (*Id.* at 34-38) At Plaintiff's November 9, 2015 chronic care visit, he complained of tinnitus and provided a history that the symptoms began about a week after the May 18, 2015 assault.[6] (*Id.* at 34-35)

---

[5] Medical records indicate the suture were "absorbable." (D.I. 57 at 3)

[6] Plaintiff had submitted a medical grievance on September 21, 2015, seeking follow-up for pain, balance issues, and tinnitus as well as a brain damage assessment. (D.I. 54, Ex. F. at 4, grievance #316993) On November 12, 2015, the grievance was denied and the decision noted that, when Plaintiff was seen by medical on November 9, 2015, he only mentioned symptoms of tinnitus and swelling in the right ankle which was x-rayed.

3

Plaintiff next saw medical on November 18, 2015, and complained of continuous tinnitus and equilibrium issues since approximately a week following the May 2015 assault. (*Id.* at Ex. C at 34) Nurse practitioner Kathryn Stillman ("Stillman") evaluated Plaintiff's x-ray and CT scans that were taken on May 18, 2015 and noted the chest x-ray showed no active disease, the cervical spine CT showed no acute cervical vertebral fracture, and the head CT showed the ventricular system was within normal limits in size, no midline shift was observed, and there was no acute intracranial abnormality. (*Id.* at Ex. C at 34) Stillman advised Plaintiff to continue his medication as prescribed, wear compression stockings, not stand too quickly, and provide time to adjust positions. (*Id.*) Stillman submitted a physical therapy referral for evaluation and possible treatment of Plaintiff's gait issues, ambulatory dysfunction, and right ankle pain. (*Id.*) Medical records indicate that on November 30, 2015, Plaintiff refused physical therapy without reason despite being asked multiple times and being advised of the risks involved in refusing treatment. (*Id.* at Ex. C at 33, Ex. H at Nov. 30, 2015 refusal of treatment)

Plaintiff had chronic care appointments on February 1, 2016 and May 28, 2016. (*Id.* at Ex. C at 32-33) Medical addressed his complaints and other symptoms related to the May 2015 assault. (*Id.*) At his August 16, 2016 chronic care appointment, Plaintiff reported experiencing intermittent dizziness since the May 2015 assault, he was diagnosed with peripheral vertigo, and prescribed medication. (*Id.* at 30)

---

(*Id.* at 5 Grievance #316993 M.G.C. Decision). Plaintiff appealed the denial on November 13, 2015. (*Id.* at p. 6 grievance #316993 appeal form)

Plaintiff reported the same symptoms at his November 8, 2016 appointment and was diagnosed with sensory ataxia. (*Id.* at 29) Physician assistant Mitchell White ("White") instructed Plaintiff to continue his medication and ordered blood tests. (*Id.* at 29) On November 30, 2016, Plaintiff submitted a sick call slip, indicated that he was being treated with new medication, complained of balance issues, and demanded an MRI to assess brain damage. (*Id.* at Ex. G at 3) Plaintiff was seen by medical on December 6, 2016, and it was noted that Plaintiff's prior multiple CT scans were negative. (*Id.* at Ex. C at 29)

On February 1, 2017, during Plaintiff's chronic care appointment, he reported diminished symptoms of tinnitus and ataxia and asked to discontinue Elavil. (*Id.* at 26) On March 24, 2017, Plaintiff was seen by medical with complaints of worsening headaches and ataxia, intermittent nausea and dizziness, and equilibrium problems, among other medical issues. (*Id.* at 24) Plaintiff was diagnosed with post concussive syndrome. (*Id.*) White submitted a request for a brain MRI and a mental health evaluation for questionable depressive disorder or PTSD from the May 2015 assault, and concluded that psychological trauma associated with the attack could be affecting Plaintiff's symptoms. (*Id.*) The brain MRI was denied as medically unnecessary due to the findings of the May 18, 2015 head CT that presented "no cause for concern." (*Id.* at Ex. I at ¶ 7)

On March 29, 2017, Plaintiff presented for his referred mental health evaluation and stated that he was confused about the visit because he was not depressed. (*Id.* at 23) Plaintiff stopped reporting symptoms of post concussive syndrome around June

2017, and did not raise the issue again until May 3, 2018, when he submitted a grievance and again demanded a brain MRI. (*Id.* at Ex. C at 1-92; Ex. F at 13 Grievance #403993)

Dr. Christopher Moen ("Dr. Moen"), the chief medical officer of Defendant Connections Community Services Program, Inc. ("Connections") states that Plaintiff was appropriately treated for all symptoms and issues he reported. (*Id.* at Ex. I) Dr. Moen states that Plaintiff's symptoms of post concussive syndrome have been actively and appropriately treated through use of medication, routine evaluations, and other treatment as needed. (*Id.* at ¶ 8) Dr. Moen states that there is no known treatment for the underlying condition of post concussive syndrome. (*Id.* at ¶ 6)

### III. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the

"mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. Anderson, 477 U.S. at 252. The same standards and burdens apply on cross-motions for summary judgment. See Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987).

IV. DISCUSSION

A. Failure to Protect/Personal Involvement

Wesley moves for summary judgment on the grounds that Plaintiff provides no evidence to support his claim of deliberate indifference.[7] (D.I. 51) Wesley argues there is no evidence of record that suggests he was present during the events at issue, and it appears Plaintiff seeks to hold him liable under an impermissible vicarious liability theory.

Plaintiff's opposition to Wesley's motion for summary judgment consists solely of argument and is not accompanied by a sworn affidavit or signed under penalty of perjury. The opposition does not cite to the record or applicable law and does not provide any supporting evidence for consideration by the Court. Plaintiff, cannot simply assert factually unsupported allegations to meet his burden at the summary judgment stage. See Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

---

[7] The motion states that it incorporates and adopts Wesley's previously filed opposition to Plaintiff's motion for injunctive relief and affidavit of Dr. Maduka and references D.I. 16 17. (See D.I. 51 at 2) Counsel is admonished to discontinue this practice. The Court disfavors piecemeal litigation and, when seeking summary judgment, all arguments should be contained in the supporting memorandum along with the supporting exhibits. The Court further notes that neither D.I. 16 nor D.I. 17 contain the affidavit of Dr. Maduka.

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In addition, "a non-medical prison official" cannot "be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference" when the "prisoner is under the care of medical experts" and the official does not have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (holding that non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").

A corrections officer's failure to intervene in a beating can be the basis of liability under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so. *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). No reasonable jury could find for Plaintiff on the issue of whether Wesley failed to intervene in the assault by Snow, given there is no record evidence that Wesley was present at that time. Nor could a reasonable jury find for Plaintiff on the issue of whether Wesley failed to protect Plaintiff from Snow since, again, there is no record evidence that Wesley was aware of a threat by Snow or that Snow could have been considered a threat to Plaintiff. *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (to prevail on

an Eighth Amendment failure to protect claim, a plaintiff is required to show that (1) he is incarcerated under conditions posing a substantial risk of serious harm (the objective element); and (2) prison officials acted with deliberate indifference, *i.e.*, that prison officials knew of and disregarded an excessive risk to inmate health or safety (the subjective element); *see also Griffin v. DeRosa*, 153 F. App'x 851 (3d Cir. 2005). Finally, there is no evidence of record that Wesley knew or believed medical personnel were not properly treating Plaintiff or that Plaintiff was not receiving medical care.

There is simply no record evidence of Wesley's personal involvement or deliberate indifference towards Plaintiff. Summary judgment is appropriate in favor of Wesley and against Plaintiff.

### B. Medical Needs

Connections moves for summary judgment on the grounds that Plaintiff has received ongoing and continuous care for his medical complaints, has not identified a constitutionally defective policy by Connections that caused his purported injuries, and has not established any past instances of similar harm to any other inmate to show an unreasonable risk of harm posed by alleged deficiencies and Connections' awareness and deliberate indifference to it.

Plaintiff responds that Connections is not providing him proper medical treatment in violation of the Eighth Amendment and that Connections' policy "is to do nothing [it feels] is to [sic] costly." (D.I. 56 at 5) In addition, Plaintiff contends that summary judgment is appropriate on his behalf because he was not provided adequate follow-up care and did not receive treatment for narcolepsy.

The Court does not address the issue of narcolepsy.[8] The Complaint does not contain any allegations that speak to the condition of narcolepsy, treatment or lack of treatment of the condition. Because Plaintiff failed to plead this claim in his Complaint, the Court will not consider it here. *See McLaud v. Indus. Res., Inc.*, 715 F. App'x 115, 121 n.5 (3d Cir. 2017) (noting that trial court properly refused to consider a claim that a party did not raise in an amended complaint but introduced for the first time in response to motion for summary judgment); *Bey v. Daimler Chrysler Servs. of N. Am.*, 2006 WL 361385, at *11 (D.N.J. Feb. 15, 2006) ("claims [that] were not alleged in the complaint [ ] cannot be raised for the first time in opposition to a motion for summary judgment").

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison

---

[8] Plaintiff attempted to improperly amend the Complaint when filed a response to Connections' answer with attached medical records that referred to narcolepsy and medication for the condition. (D.I. 49) The response was stricken and Plaintiff was advised that should he opt to file an amended complaint, he was to abide by the Local Rules of this Court. (D.I. 61) Plaintiff did not seek leave to amend following entry of that order. The Court notes that Plaintiff's answer to interrogatory No. 9 states that when was first admitted to HRYCI, he was not allowed to have his narcolepsy medication. (D.I. 54, Ex. A and ¶ 8) Dr. Shilpa Kauta ("Kauta") indicated that narcolepsy medication would not be considered until Plaintiff had consistent adequate compliance with CPAP treatment for his sleep apnea, as his symptoms could be a result of untreated obstructive sleep apnea. (D.I. 54, Ex. O at 3-4) Dr. Moen states that narcolepsy is not a condition that requires active treatment. (*Id.* at Ex. I at ¶ 12) Narcolepsy is akin to anxiety where treatment is dependent upon the symptoms the patient reports and how it impacts the patient's daily functions and livelihood. (*Id.*) Dr. Moen states that Plaintiff has not reported symptoms of narcolepsy that require medical intervention and active medical treatment has not been necessary. (*Id.* at Ex. I at ¶ 13)

officials that indicate deliberate indifference to that need. *Id.* at 104; *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *See Farmer v. Brennan*, 511 U.S. at 837.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. Apr. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). Also, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *Spruill v. Gillis*, 372 F.3d at 235 (citations omitted). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle*, 429 U.S. at 107.

A prison official may, however, manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Id.* at 104-05. A delay or denial of medical treatment claim is approached differently than an adequacy of care claim. *See U.S. ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979).

> Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry – since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim. Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim. All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-

> medical factors. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 68–9 (3d Cir. 1993); *United States v. Michener*, 152 F.2d 880, 885 (3d Cir. 1945) ("[I]t is for the jury to determine the weight to be given to each piece of evidence . . . particularly where the question at issue is the credibility of the witness.").

*Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017).

When a plaintiff relies on the theory of respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to establish that Connections is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [Connections] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of Connections' employees have violated Plaintiff's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). A "[p]olicy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict." *Miller v.*

13

*Corr. Med. Sys., Inc.*, 802 F. Supp. at 1132 (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

Plaintiff rests his claim of failure to provide follow-up care on, what appear to be, misinterpretations of medical records. For example, Plaintiff contends that he did not receive appropriate medical care because he did not receive a follow-up brain/head CT scan as suggested in the May 18, 2015 CT report. The report, however, refers to a CT scan of chest, abdomen, and pelvis, not the head. In addition, the report did not order a repeat CT scan, but merely suggested one might be considered.

Plaintiff also contends that follow-up requested an appointment with the oral and facial office. However, the discharge notes are to call for an appointment only if the HRYCI infirmary was unable to care for Plaintiff. Plaintiff's medical records indicate that he has received continuing medical care.

Plaintiff argues that he has teeth that need to be replaced. The evidence he submitted does not support his claim. Indeed, the medical records he provided make no reference to dental issues. Moreover, the Court reviewed the sick call slips and they seek medical or mental health care. (D.I. 54, Ex. G) None seek dental care. (*Id.*)

Finally, Plaintiff argues that Connections has a policy that it does not provide treatment it feels is too costly. The evidence Plaintiff submitted does not support his

claim. Plaintiff submitted medical records that indicate he received treatment and follow-up care for his injuries after the assault. There is no evidence that Plaintiff was denied treatment because it was too costly. Rather, the record reflects that Plaintiff has received, and continues to receive, adequate medical care.

No reasonable jury could find for Plaintiff on the claims raised against Connections. Therefore, the Court will grant Connections' motion for summary judgment and will deny Plaintiff's motion for summary judgment.

### C. State Actor

Plaintiff raises claims under § 1983 and has named inmate Snow as a defendant. There is no indication that he intended to raise a supplemental State claim against Snow. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). To act under "color of state law" a defendant must be "clothed with the authority of state law." *West*, 487 U.S. at 49.

Snow, is a fellow inmate, who assaulted Plaintiff. Clearly, Snow is not "clothed with the authority of state law." *See Reichley v. Pennsylvania Dep't of Agric.*, 427 F.3d 236, 244-45 (3d Cir. 2005); *Biener v. Calio*, 361 F.3d 206, 216-17 (3d. Cir. 2004). The claim fails as a matter of law and Snow will be dismissed as a defendant.

## V. CONCLUSION

For the above reasons, the Court will: (1) deny Wesley's motion to dismiss for failure to prosecute (D.I. 51); (2) grant Defendants' motions for summary judgment (D.I. 51; D.I. 52); (3) deny Plaintiff's cross-motions for summary judgment (D.I. 55; D.I. 56) and (4) *sua sponte* dismiss the § 1983 claim against Snow as it fails as a matter of law.

An appropriate Order follows.